## KENTUCKY BAR ASSOCIATION, Complainant,

v.

## William FRIEDLANDER, Respondent.

Supreme Court of Kentucky.

Jan. 23, 1976.

Rehearing Denied June 11, 1976.

John M. Famularo, Lexington, Leslie G. Whitmer, Counsel, Kentucky Bar Ass'n, Frankfort, for complainant.

Stuart E. Lampe, Timothy R. Futrell, Wyatt, Grafton & Sloss, Louisville, for respondent.

PER CURIAM.

This is a disciplinary proceeding in which the board of governors of the Kentucky Bar Association found respondent guilty of unprofessional conduct and recommended that he be permanently disbarred from the practice of law.

The charge filed against respondent by the Kentucky Bar Association stated that respondent issued two checks in the total amount of $118,609.39 which were returned by the bank to the payees because of insufficient funds.

A trial committee appointed in accordance with RCA 3.230 heard the testimony of witnesses. After finding respondent guilty of the charge, the committee recommended that he be suspended from the practice of law for a period of one year. The board of governors at a subsequent meeting considered the record pursuant to RCA 3.370, found the respondent guilty of the charge and recommended that he be permanently disbarred from the practice of law. RCA 3.380.

Respondent and his law partners organized Kentucky Insured Title Corporation in 1967. About two years after the organization of the company, respondent's law firm became the sole owners of the corporation, and the members of the firm became officers of the title company. The law firm practice was limited exclusively to real estate closings for the title company. The only meetings of the officers of the title company were the regular weekly partnership meetings of the law firm.

In July 1973, a check to the title company in the sum of $135,076.49 was received by respondent from Kentucky Mortgage Company. This check was placed in the Kentucky Insured Title Corporation's escrow account. These funds were received by respondent as attorney for Kentucky Insured Title Corporation during the course of his representation of the sponsor of an apartment structure in Paducah, Kentucky. Two checks were drawn on the title company's escrow account: one in the sum of $109,851.69, payable jointly to the contractor of the apartment structure in Paducah

and the surety guaranteeing performance of the contract; the other in the sum of $8,757.70, payable to Kentucky Mortgage Company Mortgage Investors, in payment of interest due on a mortgage on the apartment structure.

Respondent travelled to Paducah, made an examination of the title for liens and delivered the check signed by him to the contractor. He then called and directed his office to issue the other check, which was signed by one of his partners. Respondent then notified Kentucky Mortgage Company that he had disbursed the funds. Both checks were returned because of "insufficient funds." Respondent directed that the checks be redeposited. He failed in an attempt to secure a bank loan to cover the checks, and the checks were again returned for "insufficient funds."

Respondent asserts that he had every reason to believe the checks would be honored by the bank and that he would not have authorized issuance of the checks had he thought otherwise. Respondent's testimony with regard to the events leading up to the situation resulting in this disciplinary action does not bear out his assertion. We are disregarding the testimony objected to by respondent as being outside the matter contained in the charge by the Kentucky Bar Association and are considering only respondent's testimony.

After the date of organization, the business of Kentucky Insured Title Corporation increased rapidly. Large sums of money required for the many real estate closings were flowing through the company's escrow account. In 1972, the title for a project in Lexington, Kentucky, was certified by respondent's law firm; and it was later determined that there was an outstanding mortgage on the property that had been overlooked in the title search. Respondent negotiated a settlement with the mortgage holder for the sum of $42,000. According to respondent, the firm did not make a claim on their errors and omissions policy for fear that the insurance carrier would cancel the policy. Instead, the $42,000 was taken from the escrow account of Kentucky Insured Title Corporation and paid over to the mortgage holder. After that, in January 1973, there occurred a freeze in further construction funds by HUD, the federal agency which supplied or guaranteed funds for a major portion of the business of Kentucky Insured Title Corporation and respondent's law firm. After this, in order to bolster the declining volume of business, respondent's law firm acquired by purchase the National Mortgage Company, which specialized in loans for single-family dwellings. This venture was not successful and entailed a further expenditure of $40,000, which was taken out of the escrow account of Kentucky Insured Title Corporation. At the time respondent issued the two checks, subject of the charge, he states that he knew the escrow account was in the "red." He states that the accounting procedures were so confused that none of the partners in the firm knew the bank balance at any given time. He states that he and other members of his law firm wrote checks on the escrow account in anticipation of deposits to be made. This practice is referred to in the evidence as "playing the float."

Respondent testified that a "float" was involved, and "I feel that it got away from me, and that it probably got away from everybody else in the firm." On July 31st, the bank balance of Kentucky Insured Title Corporation was minus $48,000, and the company was out of business.

We are presented here with a factual situation analogous to that presented in *Kentucky Bar Association v. Tucker*, Ky., 535 S.W.2d 97 (rendered May 9, 1975), and *Kentucky Bar Association v. Collis*, Ky., 535 S.W.2d 95, (rendered May 9, 1975), which is misappropriation of trust monies by a member of the bar. No inference is necessary here. Respondent admits that he participated in the use of trust funds from the escrow account of Kentucky Insured Title Corporation for the benefit of his law firm.

We are of the opinion that such conduct is so dishonest and reprehensible as to make him unfit to remain a member of the bar. For the reasons set out in *Collis* and *Tucker*, we hold that respondent should be

permanently disbarred from the practice of law.

Respondent argues that the disciplinary rules of this court deny due process of law and equal protection of the law. We have difficulty in following respondent's argument in this respect.

First, respondent argues that RCA 3.370 provides that any member of the board of governors who "has been challenged on grounds sufficient to disqualify a circuit judge, shall be disqualified . . ."; but there is no way to challenge a member of the board of governors for the reason that respondent does not know when his case is to be considered by the board of governors and does not know which members of the board might participate. The simple answer to respondent's argument is contained in RCA 3.360, which provides that the trial committee shall file its finding and recommendations with the board and that the report shall be advisory. Obviously the proceedings are never concluded with the trial committee, so the respondent can use his own judgment in selecting a time prior to the end of the proceedings before the trial committee to make such challenges as he may desire to any members of the board. The membership of the board is known to respondent; and, further, it is not suggested that respondent desired to make a challenge in any event.

Next respondent argues that because of the extreme difference between the recommendation of the trial committee and the recommendation of the board he was entitled to answers to interrogatories addressed to the board of governors: "Did all the members of the Board receive a copy of the recommendations of the Trial Committee? Did all the members of the Board receive copies of the briefs filed in this case and have time to read them? RCA 3.370 provides that 'the Board shall promptly consider and act upon the entire record.' Did the members of the Board have time to read the entire record so that they could properly act upon it?"

The thrust of the interrogatories according to respondent was to ascertain whether any real study was given to the facts involved in this case by the board of governors.

That a reviewing body shall be subjected to such a procedure is a novel concept of due process, and the logical extension of respondent's argument is such that we conclude it is not proper to propound such interrogatories. Nor do we believe that due process or equal protection of the law is involved at all in this respect.

Suffice to say, it is obvious to us that the board did understand the record. We have read it, and our understanding and the interpretation we place on the facts lead to our conclusion that respondent should be permanently disbarred from the practice of law.

Accordingly it is ordered that the respondent be and he is hereby permanently disbarred from the practice of law in this Commonwealth, and he is required to pay the cost of this proceeding.

REED, C. J., and CLAYTON, JONES, LUKOWSKY, STEPHENSON and STERNBERG, JJ., sitting; all concur.

PALMORE, J., not sitting.